## Case No. 16,292.

### UNITED STATES v. SINGER et al.

[2 Biss. 226;[1] 18 Pittsb. Leg. J. 5; 12 Int. Rev. Rec. 98, 209; 3 Chi. Leg. News, 81.]

Circuit Court, N. D. Illinois. Jan., 1870.[2]

BONDS AND TAXES OF DISTILLERS — RETURNS OF PRODUCTION—LIABILITY OF SURETIES.

1. The 20th section of the act of July 20, 1868 [15 Stat. 133], cannot be construed as authorizing the collection of a tax on spirits which have never been actually produced.

2. A distiller is not bound to return more spirits than he has produced. If his return is less than eighty per cent. of the producing capacity of the distillery, the assessor should assess him for the deficiency, but to the claim for a tax on such alleged deficiency, the fact that such deficiency does not exist is a sufficient answer.

[Cited in U. S. v. Bicket, Case No. 14,590.]

3. The sureties on distillers' bonds, executed previous to the act of March 29, 1869 [16 Stat. 52], are not liable to reimburse to the United States the expenses and salaries charged against distillers in said act.

4. Sureties are not liable for the performance by their principal of duties not within the scope of the particular office, and which they cannot be supposed to have contemplated at the time they executed the bond.

This was a demurrer to pleas filed by the defendants [Jacob Singer and others] in an action by the United States on a distiller's bond, and also a demurrer to one of the breaches alleged in the declaration.

J. O. Glover, U. S. Dist. Atty.
George A. Meech, for defendants.

DRUMMOND, Circuit Judge. In this case the facts are, that Singer & Bickerdike as principals, and the other defendants as sureties, gave a bond on the 18th of January, 1869, to the United States in the penal sum of ninety-two thousand dollars, with the con-

dition that as Singer & Bickerdike on and after that day intended to be engaged in the business of distillers, they should in all respects faithfully comply with all the provisions of law in relation to the duties and business of distillers, and pay all penalties incurred or fines imposed on them for a violation of any of the said provisions.

The declaration alleges several breaches on this bond. The first is that Singer & Bickerdike made return of the amount of spirits that they had manufactured during the month of November, 1868, and that the quantity was less than eighty per cent. of the producing capacity of their distillery as estimated under the provisions of the internal revenue law, and that on the 10th of February, 1869, the assessor made an assessment against them for the deficiency, viz. $26,089.60, which they have not paid.

To this breach the defendants have pleaded what is termed the third amended plea, and which declares that Singer & Bickerdike made return to the assessor of all the highwines and spirits produced at their distillery during the month of November, 1868, and that an assessment was made against them for the full amount of tax on the same, and that the amount so assessed has been paid, and that no other highwines or spirits were produced at their distillery during the month of November, 1868, than what were so returned.

To this plea there is a demurrer by the plaintiffs. The declaration also contains an additional breach or count, to the effect that one Davis, an internal revenue storekeeper, was appointed by the secretary of the treasury and assigned to the distillery of Singer & Bickerdike at a salary of five dollars a day from March 4 to March 25, 1869, inclusive, thereby becoming entitled to $110 as such storekeeper, and which amount has been paid by the plaintiffs, and thereupon it became the duty of Singer & Bickerdike to reimburse to the plaintiffs this amount, but to do this they have failed.

To this breach there is a demurrer by the defendants. The first question turns upon the validity of the plea, and consequently upon the true construction of the 20th section of the act of congress of July 20, 1868. That section declares that the assessor, in order to determine whether all the spirits produced in a distillery have been returned, shall ascertain the whole quantity of materials used for the production—"and forty-five gallons of mash or beer brewed or fermented from grain, shall represent not less that one bushel of grain, and seven gallons of mash or beer brewed or fermented from molasses, shall represent not less than one gallon of molasses. If the return is less than the quantity thus ascertained, the distiller or other person shall be assessed for the deficiency, * * * and the collector shall proceed to collect the same as in cases of other assessments for deficiencies." Now, it will

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]
[2] [Reversed in 15 Wall. (82 U. S.) 111.]

be observed that the language of the section as referred to above seems to proceed on the basis that it has given a mode of ascertaining the quantity of spirits produced, by declaring that forty-five gallons of mash shall represent one bushel of grain, under the implication that when the number of bushels of grain is known, the quantity of spirits produced is exactly ascertained, an implication contrary to the fact, as is well understood by all practical distillers. If the section had arbitrarily declared how much spirits one bushel of grain should represent, then this part of the difficulty would be removed. The section concludes with this provision: "But in no case shall the quantity of spirits returned by the distiller, together with the quantity so assessed, be for a less quantity of spirits than eighty per centum of the producing capacity of the distillery as estimated under the provisions of this act."

This 20th section appears to have been framed for the purpose of prescribing a method of ascertaining the product of the distillery, or to impose a tax on its capacity as such, or to unite both, and thus if the distiller should in fact produce eighty per cent., then it was to be a tax on the product; and if less, on the capacity.

In order to determine which of these is the true meaning of this section, the facts of this case should not be forgotten. It has been conceded in the argument by the district attorney that, so far as is known and believed by the officers of the government, the distillers in this case returned all the spirits they manufactured in the month of November, 1868, and that the assessment in controversy was made upon a quantity of spirits that never existed.

In examining the act of July 20, 1868, the inquiry naturally arises—what was its object as to distilled spirits. It is entitled "An act imposing taxes on distilled spirits and tobacco, and for other purposes." The first section declares what tax shall be levied and collected on distilled spirits, and the following sections contain various provisions for ascertaining and securing the payment of the tax. The tenth section designates in what manner the true producing capacity of each distillery shall be determined, and how errors in such estimate shall be corrected. The thirteenth section imposes a daily tax upon the distiller in proportion to the capacity of his distillery for mashing and fermenting grain, etc.

The 14th, 15th, 16th, 17th, 18th and 19th sections contain various and minute directions as to the construction of buildings and machinery, and the mode of manufacture, in addition to those previously prescribed, and the main object of which appears to be to guard against dishonest practices by the distiller. Besides all this, the distiller or principal manager is to make his return three times a month, under oath, stating the quantity and kind of materials used for the production of spirits each day, and the number of wine gallons and of proof gallons of spirits produced, and he is bound to include all, because he must asseverate there was no more used or produced. After this follows the 20th section, the substance of which has been already stated, and numerous others, all of the same general purport up to the 59th, which imposes an annual special tax upon distillers in proportion, not to the capacity, but to the actual product of the distillery.

If it were the purpose of the law to assess also a tax upon the capacity alone of a distillery as representing its actual product, and in this way tax the supposed product itself, and if it be true that such a tax is something else than an assessment upon the distillery and machinery, merely because they possess a certain property or quality, then it is singular that such multifarious and complicated provisions were considered necessary to ascertain and collect the amount. If the producing capacity of a distillery is known—as so many gallons a day—then it is a simple thing to say it shall pay fifty cents as a tax on every gallon it is capable of producing; and the complex and expensive arrangements and safeguards to prevent fraud, thrown around the manufacture of distilled spirits, could be dispensed with at once. The object of so much legislation must have been to ascertain the product, and thus compel the payment of a tax on the whole of the article manufactured. Such a tax may be said to be just, as having something on which to operate, whereas a tax on the producing capacity of a distillery, if it be not a tax on the distillery itself, is often on a mere imaginary thing. It is like the attempt to tax an income where there is none.

If we examine the language of the 20th section in connection with that part of the 19th section already referred to, this view of the law will be strengthened. The distiller must return the whole of the spirits manufactured, under oath, but in no case shall the quantity returned be less than eighty per cent. of the producing capacity of the distillery, so that literally, if the distillery has produced less than eighty per cent., which is alleged to be the fact in this case, then the distiller is required to make a false return and swear to it. This certainly cannot be the meaning of this section, because a previous part of the section, after assuming—contrary to the fact—that a test of quantity had been given, directs an assessment to be made if the quantity returned shall be less than that thus ascertained.

The only construction that can be given to this section, consistent with reason and the general scope and purpose of the law, in my opinion, is, if the return is not equal to eighty per cent. of the producing capacity of the distillery, the assessor shall assume that

it ought to have been, and the distiller shall then be assessed on that basis, as a method of discovering the actual product. It could not have been intended the distiller should return what he had not produced, nor that he should pay a tax on nothing. My conclusion is that the object of this section of the law is accomplished when the distiller has paid the proper tax on all the spirits he has manufactured. The letter of the section seems to be framed on a certain theory, but it is not possible, even for an act of congress, to make a bushel of grain produce more spirits than nature has supplied and science and skill can extract. One bushel of grain is not always precisely like another, nor is distilling always carried on under precisely the same circumstances, nor with precisely similar machinery and appliances of manufacture. And if a distillery has run part of a month and it is accidentally destroyed by fire or otherwise, is the letter of the statute still to be followed and an assessment of eighty per cent. made and enforced for the whole month, when the product may have become impossible? And if not, why not? Such is a case in actual controversy in this court.

Admitting then it may have the effect of compelling the distiller to establish, when he has not returned eighty per cent. of the producing capacity of his distillery, that it was because the distillery did not produce it, I must hold, when that is done, it is an answer to the claim set up under this section for an alleged deficiency—the fact then being the deficiency does not exist. My attention has been called to the Case of Dutcher [Case No. 15,014], in this court as having some bearing on this case; but the point decided there was different from that which the government seeks to establish here against the distiller. That was where a bond had been given under the act of July 13, 1866 [14 Stat. 98], on the removal of certain highwines from one bonded warehouse to another, and where the quantity of wines was ascertained by government inspection, when delivered at the one warehouse to the owner, and received at the other from him. The highwines were delivered to the owner on condition that he would agree to pay the tax on the difference between the number of gallons as delivered and as received, less certain allowances. In that case the government held the highwines for the tax. It parted with them on a particular guaranty voluntarily entered into by the owner. The court held that he was bound by the terms of his contract, though it operated with some hardship in that instance. If it were clear that the intent of this 20th section of the act of 1868 was that the distiller should pay a tax on what his distillery did not manufacture, then, however unjust or oppressive such a provision might be, it could not be disregarded by the courts unless, indeed, on the ground that congress could not impose such a tax, which point need not now be considered. In conclusion, on this part of the case, it must be said once more that if the position of the government is correct, that the law intended to levy and collect a tax of fifty cents on every gallon of distilled spirits that a distillery was capable of producing, without regard to the fact that it was ever actually manufactured, it is to be regretted the meaning was not more clearly expressed. It was only necessary to determine the producing capacity of the distillery, and the beginning and end of its operations, and the thing was done. Instead of which we have a series of restrictions and impositions, and a system of inquisition and espionage upon distilling—admitted by the act to be a lawful occupation—which if extended to all other kinds of business, would make the collection of taxes odious and oppressive and indeed well nigh intolerable.

Nothing has been said, because the question was not made in the argument, of the application of this bond to an alleged omission of duty on the part of the principals at a time prior to the execution of the bond, a point perhaps by no means free from difficulty as affecting the sureties, whatever may be its bearing on the principals.

Neither has any stress been placed on what is said to be true, that the commissioner of internal revenue, on being satisfied in some other cases that all the spirits manufactured were returned and the tax paid thereon, directed that the assessments should not be enforced, because the question really is whether it is a matter of discretion with the commissioner or of right upon the part of the distiller. The demurrer to the third amended plea will therefore be overruled.

The second question arises on the demurrer of the defendants to the second breach in the declaration. The law in force at the time this bond was executed (section 52, Act July 20, 1868) required that the United States should pay the internal revenue storekeeper, and in conformity therewith, Davis, the storekeeper in this case, was paid by the government the sum of $110, being at the rate of five dollars a day while employed and assigned to the warehouse of Singer & Bickerdike, and all of which was after the execution of the bond in this case. On the 29th of March, 1869, congress passed a joint resolution directing that certain items omitted in the enrollment of the appropriation act of March 3d, 1869 [15 Stat. 301], were to be added as amendments thereto, among which was this proviso: "That after the passage of this act the proprietors of all internal revenue bonded warehouses, shall reimburse to the United States the expenses and salary of all storekeepers or other officers in charge of such warehouses, and the same shall be paid into the treasury and be accounted for like other public moneys."

It will be seen, therefore, that Singer & Bickerdike by this were required to repay to the United States what the latter had paid to Davis, and the question is—to say nothing

about its effect on the principals—whether the sureties are liable by such an ex post facto resolution of congress operating upon the condition of this bond, executed the 18th of January previous, in such a way as to give it validity against them. I think they are not. It is a matter of grave doubt whether this bond stands on the same footing as an official bond; but conceding that to be so, what is the true rule on the subject?

One of the best considered cases to which the attention of the court has been directed, is that of Governor of Illinois v. Ridgway, 12 Ill. 14, where the supreme court of Illinois discusses and decides upon the effect of subsequent legislation on the liability of sureties to official bonds, and where this rule is stated. The sureties of an officer on his official bond are liable for the faithful performance of all duties imposed on him, whether by laws previous or subsequent to the execution of the bond, if they properly belong to and are within the scope of the particular office, and not for those unconnected with it and which cannot be supposed to have been contemplated by the parties at the time they executed the bond.

Some such principle as this must be adopted or the contract of a surety, instead of being construed strictly, as confessedly it should be, is extended so as to include obligations that he never assumed. Can it be fairly said to have been within the contemplation of the sureties in this case, that their principals would be required to refund money which the government by existing law, if a storekeeper was employed and assigned, was obliged to pay, and that thus they were to be held accountable for such an act done and default made after they signed the bond?

If this be so, where is the limit to the responsibility which may in this manner be cast upon a surety to an official bond? The contract of a surety is secondary. He is bound for the acts of his principal and not his own, and if it be true, that for what is fairly within the contemplation of the parties, though ex post facto, he is bound, yet if we go beyond that, it would seem to violate the fundamental principles of the contract of the surety.

If the rule insisted on by the government in this case is maintainable, it is difficult to see why the sureties to this bond could not in the same manner and by equivalent legislation be made to reimburse the United States for the whole expense of collecting every dollar of tax paid on distilled spirits by their principals.

The decisions of the courts of the United States, which are collected and cited by Mr. Brightly in his "Federal Digest," 822, upon the contracts of sureties, are in conformity with the opinion here given.

The demurrer to the second breach will therefore be sustained.

[Judgment having been given for defendants, a writ of error was sued out from the supreme court. The judgment of this court was reversed, and the cause remanded for further proceedings, with leave to the defendants to plead anew to the first count of the declaration. 15 Wall. (82 U. S.) 111.]